In an Order filed February 3, 1995 in this matter, the Full Commission noted: "A primary controversy before the Deputy Commissioner, on divided expert opinion, was whether additional surgery was appropriate and due at defendants' expense. Dr. Califf performed fusion surgery after the record before the Deputy Commissioner was closed, and plaintiff moved for admission of his medical notes, recorded during the three months following the surgery which suggest that it succeeded in alleviating her pain." Because plaintiff's physical condition at the time of the surgery and her course following surgery could shed light on issues raised by this appeal, the Commission ordered that the parties could discover and submit certain evidence pertinent to plaintiff's post-hearing treatment and condition. The parties have stipulated the medical records of Dr. Califf covering the period from 8/17/93 to 2/22/95, including his operative report of plaintiff's August 19, 1993 fusion surgery, and these are now ADMITTED into evidence as a part of the record.
The Full Commission has reviewed the record with reference to the errors assigned, and makes the following
FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was a 29 year old married female with two children who had sustained an admittedly compensable injury by accident on November 16, 1987.
2. Plaintiff began employment with defendant in 1986 as a knitter whose job duties included frequent bending, reaching at waist level and standing throughout an eight hour shift. Prior to beginning work with defendant, plaintiff had been employed by other textile companies in various positions.
3. Plaintiff had a tenth grade education at the time of the accident, and has subsequently attained her GED. At the time of the hearing before the Deputy Commissioner, the plaintiff was attending cosmetology school.
4. Following her injury in November, 1987, plaintiff, who was four months pregnant, was seen by Dr. Smith on December 22, 1987. Dr. Smith diagnosed a lumbosacral strain and released plaintiff to return to work on January 5, 1988 with the instructions that she not lift more than 15 to 20 pounds, avoid frequent bending, and that "if doing well", she could return to regular duties after two weeks. Plaintiff only worked two days before returning to Dr. Smith with complaints of reoccurrence of low back pain and a new symptom, neck pain. Dr. Smith excused plaintiff from work duties. Following delivery of her child, Dr. Smith referred plaintiff to physical therapy for conservative treatment. Plaintiff continued to complain of pain, and a CT scan was performed. The CT scan revealed a bulging disk at the L5-S1 level.
5. Plaintiff was referred for a neurological evaluation by Dr. Nudelman, who reported no significant radiculopathy, and an impression of "chronic myofacial type pain". Thereafter, plaintiff was released to return to part time, light work duties on October 5, 1988.
6. Plaintiff returned to work for defendant in October, 1988, but subsequently ceased employment due to continuing complaints of back and leg pain. Plaintiff was next employed as a route deliverer for a newspaper, and continued to seek medical treatment for back pain, with occasional numbness and radiation into her lower extremities, associated with prolonged sitting, walking, or other physical activities.
7. On April 20, 1989, plaintiff was seen by Dr. Powers, an orthopedic surgeon, who referred plaintiff for a myelogram and CT scan. The CT scan again revealed a centrally located bulging disk at the L5-SI level with evidence of a thecal sac deformity without apparent nerve compression. In light of plaintiff's failure to respond to conservative treatment, plaintiff subsequently underwent hemilaminectomy and discectomy at the L5-S1 level in August, 1989. Following said surgery, plaintiff's back pain improved. However, by November 1989, plaintiff again began to complain of back pain which radiated into her right leg.
8. On November 22, 1989, an examination of plaintiff by Dr. Powers revealed no objective findings to explain plaintiff's continuing complaints of right leg pain, but he was "unable to argue with her subjective pain". Although he gave her an overall rating of 5% permanent partial disability and no disability regarding the leg, he did not find that she had reached maximum medical improvement, noting that she "would be about 100%" of maximum medical improvement in another nine months, or one year post-surgery. On examination in February, 1990, Dr. Powers found straight leg raising was negative bilaterally and possible "embellishment" was noted on sensory examination. There was no evidence of compressive radiculopathy. He referred plaintiff to Dr. Kihlstrom at the Southwind Spine Rehabilitation Center for his work hardening program, which would help determine whether she had actual impairments due to the lumbar problem. After her surgery in August, 1989, prior to entering the work hardening program, plaintiff worked with her sister for approximately three months cleaning apartments, working between 16 and 20 hours per week earning $5.00 an hour. She was also working with her father boarding socks for approximately six months earning $4.00 an hour. These jobs allowed plaintiff to sit or stand when she wished. Plaintiff quit these positions when she entered the work hardening program. Due to her children's illnesses, plaintiff missed several appointments at work hardening and her completion of the program took longer than anticipated. MMPI testing performed during this period was indicative of social anxiety, nervousness, tension, anxiety, and depression. Also, while being treated at the program, plaintiff's marital difficulties were discussed, and she related several separations from her husband and her plans to separate from him permanently.
9. As of June 11, 1990, following completion of the work hardening program, Dr. Powers opined that plaintiff had no permanent disability, and released her to return to work with a 35 pound weight restriction. On June 18, 1990, plaintiff became employed as a knitter with Stanley Mills in a position within that restriction and approved by Dr. Powers. When contacted by Vickie Moser, the rehabilitation specialist working with plaintiff, on June 23, 1990, plaintiff reported that she was "doing okay" on the job. However, on of June 24, 1990, plaintiff ceased her employment with Stanly Mills due to a combination of physical pain, and problems with her husband because of her attempts to work with the pain.
10. Plaintiff saw Dr. Smith on July 27, 1990, and related a history of being unable to continue her work as a knitter in June 1990 due to back pain associated with a little tingling in her right leg. Examination revealed that plaintiff was able to get on and off the examination table with minimal difficulty, reflexes were normal, and straight leg raising was negative bilaterally. Plaintiff was referred for a bone scan which was negative.
11. According to the medical evidence of record, plaintiff next received medical treatment several months later on February 4, 1991. Dr. Powers had referred plaintiff to the Pain Clinic at North Carolina Memorial Hospital where she was seen by Dr. Ghia. Plaintiff complained of back pain and intermittent right leg pain which worsened with standing and walking. During the time she was seen in the Pain Clinic, Dr. Ghia's examinations failed to reveal any objective findings corroborative of plaintiffs complaints on examination. Plaintiff failed to gain substantial relief from injection therapy. Dr. Ghia's impression was that plaintiff's pain was muscular in origin and she was encouraged to use a TENS unit, practice physical therapy consistently, and lose weight. It was felt that it would be beneficial for plaintiff to return to work and she was encouraged to do so.
12. Plaintiff self-referred to the Kernodle Clinic in October, 1991, and thereafter came under the care of Dr. Califf, an orthopedic surgeon. When plaintiff saw Dr. Califf in November, she continued to relate a history of back pain which occasionally radiated into her right knee. During this initial evaluation, plaintiff also related to Dr. Califf that her leg pain was not as bad as it had been prior to the surgery of August, 1989, but suffered daily pain and more intense pain with almost any activity, and said she could not perform her daily activities at home. Subsequent to the 1989 surgery, plaintiff had not had any radiological exam, other than a bone scan. Dr. Califf ordered an MRI scan which revealed some scarring and a possible recurrent disk herniation at the L5-Sl level. Dr. Califf recommended a discogram to locate the source of pain. It was performed in February, 1992, and it did reproduce plaintiff's complaints of pain at the L5-Sl level. On the basis of plaintiff's complaints of disabling pain and the results of the discogram, which showed that the L5-S1 disk was ruptured, Dr. Califf recommended that the plaintiff undergo fusion surgery. He opined then that without this surgery, plaintiff had sustained a 20 to 25 percent permanent partial disability to her back. He felt that it was inconsistent of Dr. Powers to find plaintiff had no permanent partial disability, but had a 35 pound lifting restriction. On February 21, 1992, plaintiff returned to Dr. Powers for an evaluation which confirmed Dr. Califf's finding of evidence of some scarring around the nerve root.
13. Dr. Califf saw plaintiff again on February 24, 1992, and concluded she was still having the same symptoms and that surgery should improve her activity level. Dr. Califf noted that, prior to this appointment, plaintiff had been to doctors in Chapel Hill and it had been recommended that she be sent again to a pain clinic. Dr. Califf felt that because the pain was coming from the disk space, and had not resolved since 1989, the pain clinic would not be of any long-term benefit to her. In his notes of December 13, 1991, Dr. Califf indicated plaintiff had never reached maximum medical improvement following her lumbar laminectomy in August, 1989. Dr. Califf noted in a March, 1993 deposition that while his objective findings on physical examination were not consistent with plaintiff's subjective complaints, it was "not unusual" for someone "with a degenerative disk, particularly people that have had surgery, to have pain exacerbated by activity." They "frequently do not have any leg weakness or deficiencies, but the pain is such that when they try to do things, they hurt." No tests had been performed following the 1989 surgery up to the time she saw him in 1991 adequate to determine the source of her continuing pain. Furthermore, he disagreed with Dr. Carter's July, 1992 opinion that plaintiff's problems were related to her weight and poor conditioning. Dr. Califf did not believe exercise would improve her chronic pain, without surgery. Plaintiff had gained 15 pounds due to pain induced inactivity between the time of her first surgery on August 8, 1989 and her examination at Chapel Hill on February 4, 1991, but had lost 21 pounds by January 25, 1993 in a weight-loss program, and still suffered pain and numbness when sitting or standing in one position for more than 10 to 15 minutes.
14. Plaintiff was seen at the defendants' request by an orthopaedic surgeon, Dr. Phillip Carter, on July 16, 1992 and again on January 5, 1993. He reviewed her records and examined her very briefly on each occasion. He found her subjective complaints of pain consistent with his objective findings. He opined plaintiff had reached maximum medical improvement from the disk problem alone (excluding deconditioning) as of approximately August, 1990, or one year post-surgery, and that she had sustained a 10% permanent partial disability to her back as of that time, but he did not believe she had reached maximum medical improvement. Dr. Carter noted that plaintiff was probably capable of engaging in appropriate flexion exercise program, but should not do extension exercises. He noted on her last appointment with him that plaintiff had lost 17 pounds on the program he recommended, and had gone to cosmetology school to try to improve herself.
15. On October 20, 1992, while continuing to attend classes for her GED, plaintiff enrolled part-time in a cosmetology program at a local beauty college where she attended classes Tuesday through Thursday from 5:00 p.m. to 9:00 p.m., and Saturday from 8:30 a.m. to 5:30 p.m. On December 28, 1992, she complained of back and leg pain due to standing at school for an extended period, and she subsequently took anti-inflammatory medication, but continued with her class schedule. Her actual ability to earn some wages following the 1989 surgery, and her ability to keep this schedule, demonstrates that she was capable of earning wages, and no longer totally disabled, on and after October 20, 1992. Plaintiff has failed to show the degree of a diminution in her capacity to earn pre-injury wages, if any, on and after that date, aside from that associated with her 1993 surgery.
16. On August 19, 1993, Dr. Califf performed a right L5-Sl laminectomy, discectomy, partial facetectomy and foraminotomy, and an L5-Sl posterolateral fusion. The surgery revealed an "obvious disc re-herniation in the lateral recess at the L5-S1" and nerve root compression. Plaintiff's pain has decreased very significantly since Dr. Califf's surgery.
17. Plaintiff's back pain prior to the 1993 surgery impaired her ability to perform daily physical activities and limited the range gainful employments which she could perform. The surgical treatment rendered by Dr. Califf was reasonably necessary to affect a cure for, and give relief from significant pain, and to lessen the period and degree of vocational limitation resulting from the subject injury by accident. Defendants did not offer plaintiff this treatment, nor agree to pay for it. Plaintiff sought the Commission's approval for these medical compensation services within a reasonable time after electing to obtain them.
18. As a result of the surgical treatment on August 19, 1993 necessitated by the subject injury by accident, plaintiff was totally disabled until January 11, 1994, at which time she resumed her pre-surgery activities, including the cosmetology classes, with less limitation on physical activity due to pain and discomfort.
19. As of February 22, 1995, the plaintiff was working full-time as a hairdresser and had reached maximum medical improvement with a 25% permanent partial disability of the back.
* * * * * * * * * * * * * * *
Based on the foregoing findings of fact, the Full Commission makes the following additional
CONCLUSIONS OF LAW
1. As a result of the compensable injury by accident on November 16, 1987, plaintiff was temporarily totally disabled from June 24, 1990 through October 20, 1992 and August 19, 1993 to January 11, 1994, in addition to those periods for which she was compensated prior to June 18, 1990. N.C. Gen. Stat. § 97-29.
2. As a result of the injury by accident giving rise hereto, plaintiff sustained a 25% permanent partial disability of the back for which she is entitled to compensation at the rate of $155.42 per week for a period of 75 weeks. N.C. Gen. Stat. § 97-31(23).
3. The treatment rendered by the Kernodle Clinic, including Dr. Califf's surgery of August 19, 1993, was reasonably necessary to give relief from pain and physical impairment sustained by reason of the injury by accident giving rise hereto, and authorization from the Commission for this treatment was timely sought. Defendants are, accordingly, liable for expenses of said medical treatment. N.C. Gen. Stat. § 97-25; Schofield v. The GreatAtlantic and Pacific Tea Co., 299 N.C. 582, 595, 264 S.E.2d 56
(1980); Davis v. City of Charlotte, I.C. 865291, 8 March 1991.
* * * * * * * * * * * * * * * * *
Based on the foregoing findings of fact and conclusions of law, the Full Commission enters the following
AWARD
1. Defendants shall pay plaintiff additional compensation for temporary total disability at the rate of $155.42 a week for the periods from June 24, 1990 through October 20, 1992 and August 19, 1993 to January 11, 1994, and an additional 75 weeks of compensation in respect to plaintiff's permanent partial disability as of February 22, 1995, subject to the attorney fee hereinafter approved. Said sums having accrued, defendants shall pay these benefits in lump sum.
2. Defendants shall pay all bills for medical compensation rendered as a result of the subject injury by accident, including those of the Kernodle Clinic and Dr. Califf, when the same have been submitted to the defendants and approved in accordance with the Rules of the Commission.
3. A reasonable attorney's fee equaled to 25% of the cash or indemnity compensation herein awarded is approved for plaintiff's counsel of record, and shall be paid directly to him.
4. Defendants shall pay the costs due this Commission.
 S/ _____________ J. RANDOLPH WARD COMMISSIONER
CONCURRING:
S/ _____________ J. HOWARD BUNN, JR. CHAIRMAN
S/ _____________ COY M. VANCE DEPUTY COMMISSIONER
JRW/jss/md 9/17/96